******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring in part and dissenting in part. The majority concludes that the common-law litigation privilege bars the claims of the plaintiff, Tamara Dorfman, against the defendant Liberty Mutual Fire Insurance Company[1] for breach of the implied covenant of good faith, negligent infliction of emotional distress, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq. My disagreement stems from the unique features of the present case that distinguish it—starkly, in my view—from any other case yet decided by this court regarding the privilege. The litigation privilege exists to create a protected space for parties to engage in the rough-and-tumble of litigation, uninhibited by fears that their adversary will later file a second generation lawsuit claiming damages for harm caused by the adversary's (or his lawyer's) alleged misconduct in the first case.[2] Except for a narrow category of claims involving misconduct comparable to vexatious litigation or abuse of process, the litigation privilege prevents an aggrieved party from bringing a damages lawsuit for harm caused by litigation misconduct and limits the party's recourse to whatever relief may be obtained from the judge presiding over the litigation or the administrative authority with jurisdiction over the party or lawyer responsible for the misconduct. This judge made policy makes good sense in the ordinary case.

The present lawsuit is nothing like the ordinary case, however, because it arises in a unique context implicating substantially different policy considerations than those that shaped the litigation privilege. The defendant sells automobile liability insurance. It consequently owes its insureds a direct contractual and statutory duty to not act abusively in litigation. Litigation is not an unusual or occasional activity external to the defendant's business operations but, instead, is an integral and intrinsic part of its commercial activity—automobile liability claims by their very nature are adjusted, contested and/or paid either in the shadow of litigation or in actual litigation. This fact distinguishes the defendant from nearly all other litigants who might claim protection under the litigation privilege. Indeed, Connecticut statutory law recognizes that insurance companies are fundamentally different from other parties when it comes to litigation with their insureds. See General Statutes § 38a-816 (6) (G) (listing as prohibited unfair claim settlement practice "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds") So, too, our common law recognizes

that an insurer owes its insured a duty of good faith that would prohibit litigation misconduct in a first-party action seeking payment under a policy.[3]

Allowing a liability insurer like the defendant to invoke the privilege in the present case effectively confers an entire class of commercial enterprises doing business in Connecticut with immunity from suit by consumers seeking damages for wrongful and illegal acts undertaken *as part of their day-to-day business practices.*[4] It could be argued that such a broad immunity is wise policy in light of the competing considerations at play. But, in my view, that conclusion is hardly self-evident, and it certainly is not compelled or even suggested by either our existing precedent or the few statutory tea leaves currently available for guidance.

There are alternatives. One is to defer to the legislature regarding this complex issue of public policy; if a broad immunity is to be extended to insurance companies in this context, it should be conferred by an affirmative act of the legislature upon consideration of all relevant policy implications, not by this court under the rubric of the common-law litigation privilege. Another option, developed at some length in this opinion, is to fashion a more nuanced privilege adapted to cases involving parties, like the defendant in the present case, whose commercial activities involve frequent use of the courts as an integral aspect of their business operations and who are alleged to have breached a contractual, common-law, or statutory duty owed to the plaintiff by engaging in, among other things, litigation misconduct. Indeed, our existing litigation privilege doctrine, properly applied, is well suited to the task. See parts II C and III B of this opinion.

To summarize, the present context is miles away from that in which the litigation privilege was originally formulated, and lies equally distant from the cases in which we have found the privilege applicable to date. The plaintiff is not simply the defendant's adversary; she is its insured. Her lawsuit alleges that the defendant purposely engaged in bad faith insurance claim settlement practices involving both prelitigation and litigation misconduct, in violation of its statutory and common-law duties. The pleadings do not allege merely that the defendant has violated the rules of fair litigation owed to one another by all parties to litigation. Rather, the pleadings allege that the defendant insurer has violated a direct, independent contractual and statutory duty owed specifically to the plaintiff-insured. For reasons that I will elaborate on, such allegations, if sufficiently pleaded, should be deemed to fall outside of the litigation privilege under Connecticut law.

I

My concerns focus primarily on two counts of the plaintiff's operative complaint. With respect to the claim

for breach of the implied covenant of good faith and fair dealing, I would hold, contrary to the majority's conclusion, that the operative complaint sufficiently alleges conduct outside of litigation that would support a bad faith claim. Specifically, the operative complaint alleges that the defendant insurer was contractually obligated to pay the plaintiff sums that she was legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle for damages resulting from bodily injury, that the defendant knew that it had no valid defense to her claim, and that the defendant nonetheless compelled its insured to resort to litigation and to endure litigation misconduct to obtain payment. To the extent that the plaintiff also alleges bad faith *litigation* conduct, I would conclude that the majority's suggestion that the litigation privilege bars all such claims fails to adequately address the complexity of the law governing such claims, especially as the law applies to first-party claims by an insured against his or her insurer. Particularly in light of the special considerations that arise in the insurance context—most notably, the asymmetry between the insured and the insurer with respect to bargaining power and litigation experience, and the special vulnerabilities of an insured who has suffered a covered loss—I would conclude that this claim more closely resembles an abuse of process claim than claims to which we have applied the litigation privilege, such as defamation and fraud, and is sufficient to survive a motion to dismiss. Accordingly, I dissent from part II of the majority opinion.[5]

With respect to the plaintiff's CUTPA claim, I agree that her particular allegations fail to plead a general business practice triggering a CUIPA violation. I therefore concur in part IV of the majority opinion. I write separately to emphasize my view that this limited holding, based on insufficient pleading, in no way requires a similar conclusion were a plaintiff to make more robust allegations of litigation misconduct occurring as part of an insurance company's unfair claim settlement practices under § 38a-816 (6).[6] The majority accurately describes the exceedingly weak nature of the plaintiff's CUIPA based allegations in the present case, acknowledging that this could be a "closer case" if the plaintiff had alleged a different CUIPA claim. Part IV of the majority opinion. I believe that a well pleaded CUIPA/CUTPA claim alleging unfair claim settlement practices encompassing litigation misconduct would present a very different case indeed. Whatever the ultimate outcome may be when such a case presents itself, I feel compelled to explain why we should exercise care to make sure that our narrow holding in the present case does not impinge on our ability to conduct the necessary analysis at that time.

## II

### A

I first address part II of the majority opinion, in which

the majority concluded that the litigation privilege bars the plaintiff's claim for breach of the implied covenant of good faith and fair dealing. I begin with a review of the governing legal principles. Numerous courts have recognized that, generally speaking, an insurer has an obligation to its insureds that goes beyond an ordinary contractual obligation. See, e.g., *Best Place, Inc.* v. *Penn America Ins. Co.*, 82 Haw. 120, 128, 920 P.2d 334 (1996) ("some courts have emphasized the special relationship between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility" (internal quotation marks omitted)); id. (citing cases). This "special relationship" arises because "[a]n insurance policy is not obtained for commercial advantage; it is obtained as protection against calamity. [Moreover] [i]n securing the reasonable expectations of the insured under the insurance policy there is usually an unequal bargaining position between the insured and the insurance company. . . . [Finally] the insured is [often] in an especially vulnerable economic position when such a casualty loss occurs." (Internal quotation marks omitted.) Id.; see *Reynolds* v. *American Hardware Mutual Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243 (1988) (citing cases from other jurisdictions); *Arnold* v. *National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987) ("[i]n the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims"); see also footnote 3 of this opinion.

Although this court has yet to speak on the precise nature of the duty in the context of first-party (insured versus insurer) claims,[7] there can be no doubt that insurance contracts impose a duty of good faith and fair dealing on the insurer that will support an independent cause of action. See *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 170, 530 A.2d 596 (1987) ("[a]n implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships, including . . . insurance contracts" (internal quotation marks omitted)). *Buckman* explained: "[T]his court recognizes an independent cause of action in tort arising from an insurer's [common-law] duty of good faith. This cause of action is separate and distinct from the plaintiff's statutory claims. See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 566, 479 A.2d 781 (1984); *Burgess* v. *Vanguard Ins. Co.*, 192 Conn. 124, 127, 470 A.2d 244 (1984); *Bibeault* v. *Hanover Ins. Co.*, 417 A.2d 313 (R.I. 1980). An 'implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships, including . . . insurance contracts; *Hoyt* v. *Factory Mutual Liberty Ins. Co.*, 120 Conn. 156, 159, 179 A. 842 (1935); *Bartlett* v. *Travelers Ins. Co.*, 117 Conn. 147, 155, 167 A. 180 (1933); cf. *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*,

34 Conn. [Supp.] 46, 375 A.2d 428 (1977) . . . .' *Magnan* v. *Anaconda Industries, Inc.*, supra [566]; see also 2 Restatement (Second), Contracts § 205 [p. 99 (1981)]; 43 Am. Jur. 2d [224–28], Insurance §§ 141, 142 [1982]; 3 [M. Rhodes, Couch on Insurance (2d Ed. 1984)] § 25.32 [pp. 327–31]." *Buckman* v. *People Express, Inc.*, supra, 170–71.

More recently, we have summarized the elements of such a claim, again in the insurance context: "[I]t is axiomatic that . . . every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed [on] by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . .

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 794–95, 67 A.3d 961 (2013). "[V]iolations of express duties are necessary to maintain a bad faith cause of action." Id., 797.

In the present case, the majority concludes that, because the plaintiff's bad faith claim is based on alleged misconduct during the litigation, it is barred by the litigation privilege. See part II of the majority opinion. In part II B of this opinion, I explain why I disagree with the majority's conclusion that the plaintiff's bad faith claim is based exclusively on litigation conduct and why the prelitigation misconduct at issue is actionable in a bad faith claim under Connecticut law. In part II C, I explain why, to the extent that the claim is based on litigation conduct, the majority's analysis fails to adequately grapple with the relevant legal principles.

B

In the operative complaint, the plaintiff alleges that the defendant "agreed to pay [her] all sums [that she] was legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle for damages resulting from bodily injury sustained by [her] in an accident involving the maintenance or use of the uninsured or underinsured motor vehicle, up to the

limits of its contract." Although the operative complaint is not a model of clarity, it fairly can be read as also alleging that all of the conditions for the performance of the defendant's obligation to pay her for her bodily injuries were met at the time this action was initiated, the defendant knew at that time that it was obligated to pay the plaintiff, and it nevertheless refused to pay the claim but, instead, "compelled [the plaintiff] to resort to litigation to obtain what was due to her" under the insurance policy.[8] As I noted previously in this opinion, CUIPA expressly identifies such conduct as an unfair claim settlement practice if it is part of a general business practice. See General Statutes § 38a-816 (6) (G) ("compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds" is unfair claim settlement practice). Although a single instance of such conduct does not give rise to a CUIPA violation in the absence of a general business practice, an insurer's refusal to honor a contractual obligation to pay a claim for no good reason does constitute bad faith conduct sufficient to state a claim for breach under our common law. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 795 (refusal to perform express contractual obligation not prompted by honest mistake constitutes bad faith). I would therefore conclude that these allegations—which do not implicate the litigation privilege because they do not involve any litigation conduct by the defendant—are sufficient to withstand a motion to dismiss.

The majority, in my view, fails to acknowledge that the contractual obligations of liability insurance companies to their insureds are treated differently under Connecticut law than the obligations of most other contracting parties. Many parties may risk nothing more than contractual liability if they choose to meet a legitimate contractual demand with the time-honored response, "so sue me." An insurance company defending a first-party claim is different because it is subject to a higher duty under our common law and can incur liability if it compels its insured to resort to litigation to obtain payment due under its insurance policy. See part II A of this opinion (discussing common law); cf. General Statutes § 38a-816 (6) (G). The litigation privilege does not bar such a claim.

C

To the extent that the plaintiff's bad faith claim is based in part on her allegations of litigation misconduct, it is far from clear to me that it is barred by the litigation privilege, and I am unpersuaded by the majority's application of the privilege under these circumstances. There is good reason to develop a more nuanced doctrine adapted to cases involving parties whose commercial activities involve frequent use of the courts as an intrinsic compo-

nent of their business activities, and who are alleged to have breached a duty owed to the plaintiff in part by engaging in litigation misconduct. Our existing litigation privilege doctrine, properly applied to the present circumstances, readily accommodates this approach.

As the majority recognizes, when confronted with the question of whether the litigation privilege bars a claim, the inquiry is whether, viewed in its factual context, the plaintiff's claim—be it for fraud, tortious interference, or a statutory violation—is more like a claim for defamation or fraud, on the one hand, or a claim for vexatious litigation or abuse of process, on the other. See *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 631, 79 A.3d 60 (2013) (considering whether "the allegations in the counterclaim [for retaliation] are more akin to an abuse of process claim [than] a defamation or tortious interference claim" (internal quotation marks omitted)); *Simms* v. *Seaman*, 308 Conn. 523, 547–51, 69 A.3d 880 (2013) (analyzing whether fraud is similar to defamation for purposes of litigation privilege). Applying this analysis to the plaintiff's claims of bad faith, and even assuming that the claim relies necessarily on allegations of litigation misconduct, I would find that the complaint is not barred by the privilege.

The majority acknowledges that the litigation privilege does not bar abuse of process type claims but concludes that the plaintiff's bad faith claim is barred because it more closely resembles the type of claims to which the privilege applies, such as defamation and fraud. Specifically, the majority concludes that the bad faith claim is barred because, like defamation and fraud claims, (1) the claim was based exclusively on false statements made by the defendant in court filings; part II B of the majority opinion; (2) the plaintiff does not "challenge the purpose of any underlying litigation"; part II A of the majority opinion; and (3) other remedies exist for the complained of conduct. Part III C of the majority opinion. I disagree and would conclude that the bad faith claim fits comfortably within the framework of an abuse of process claim because it adequately alleges that the defendant acted with an improper purpose within the meaning of the common-law abuse of process doctrine.[9]

A careful examination of the common-law tort of abuse of process demonstrates why, contrary to the majority's conclusion, the plaintiff's bad faith claim in the present case—based not only on allegations that the defendant improperly compelled the plaintiff to resort to litigation to obtain payment, but that the defendant then misused litigation procedures in an attempt to avoid or delay the performance of its contractual obligation to pay the plaintiff's valid claim—is far more similar to an abuse of process claim, to which the litigation privilege does not apply, than to a claim of defamation or fraud, to which the privilege does apply.

This court previously has held that, "[b]ecause the tort [of abuse of process] arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, [§ 682 of the Restatement (Second) of Torts] emphasizes that the gravamen of the action . . . is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed . . . . Comment [b] to § 682 explains that the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." (Emphasis in original; internal quotation marks omitted.) *Mozzochi* v. *Beck*, 204 Conn. 490, 494, 529 A.2d 171 (1987); see 3 Restatement (Second), Torts § 682, p. 474 (1977); 3 Restatement (Second), Torts, supra, § 682, comment (b), p. 475. Comment (a) to § 682 further provides that "it is immaterial that the process was properly issued, *that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose*, or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this [s]ection." (Emphasis added.) 3 Restatement (Second), Torts, supra, § 682, comment (a), p. 474. Thus, *Mozzochi* and § 682 of the Restatement (Second) of Torts clearly indicate that the fact that the underlying proceedings had a proper overall purpose does not immunize a party from a claim for abuse of process when the claim alleges that the defendant has used a particular judicial procedure for an improper purpose, as, indeed, the majority concedes. See part II A of the majority opinion ("the plaintiff's cause of action must itself challenge the purpose of the underlying litigation or litigation procedure").[10]

The tort of abuse of process is not well defined.[11] See *Italian Star Line, Inc.* v. *United States Shipping Board Emergency Fleet Corp.*, 53 F.2d 359, 361 (2d Cir. 1931) ("the elements vital to an action for abuse of process are not clearly defined, either by the cases or by writers on the subject"); *Mozzochi* v. *Beck*, supra, 204 Conn. 496 ("[c]ourts have struggled to determine under what circumstances . . . a complaint states a cause of action for abuse of process"); *Board of Education of Farmingdale Union Free School District* v. *Farmingdale Classroom Teachers Assn., Inc., Local 1889, AFT AFL-CIO*, 38 N.Y.2d 397, 400, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975) ("this tort is an obscure one . . . one which is rarely brought to the attention of the courts . . . and the vital elements of which are not clearly defined" (citations omitted)). There appears to be general agreement, however, that "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding

itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 121, p. 898; accord *Preferred Properties, Inc.* v. *Indian River Estates, Inc.* 276 F.3d 790, 801–802 (6th Cir.), cert. denied, 536 U.S. 959, 122 S. Ct. 2663, 153 L. Ed. 2d 838 (2002); see also *Board of Education of Farmingdale Union Free School District* v. *Farmingdale Classroom Teachers Assn., Inc., Local 1889, AFT AFL-CIO*, supra, 404 ("[L]egal procedure must be utilized in a manner consonant with the purpose for which that procedure was designed. [When] process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party."). A number of courts have held that this definition is capacious enough to include an attempt by an insurance company to use legal procedures to bully the opposing party into abandoning litigation or settling it favorably. See *General Refractories Co.* v. *Fireman's Fund Ins. Co.*, 337 F.3d 297, 308 (3d Cir. 2003) (if severe enough, using litigation process to harass, drain resources, delay payment and delay litigation can constitute abuse of process); *Crackel* v. *Allstate Ins. Co.*, 208 Ariz. 252, 260, 92 P.3d 882 (App. 2004) ("[The plaintiffs] maintain that [the defendant insurer] used the prospect of sustained and expensive litigation as a 'club' in an attempt to coerce them, and other similarly situated claimants, to surrender those causes of action that sought only modest damages. We have little trouble concluding that such a use of court processes would be improper."); *Givens* v. *Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 401 (Tenn. 2002) ("a primary desire to harass and cause unnecessary expense to the other party in litigation is a sufficient ulterior motive to constitute an abuse of process"); *Givens* v. *Mullikin ex rel. Estate of McElwaney*, supra, 401–402 (insurer's intent to weaken claimant's resolve to pursue litigation is improper purpose); see also *Bull* v. *McCuskey*, 96 Nev. 706, 709, 615 P.2d 957 (1980) (filing lawsuit to coerce nuisance settlement constitutes abuse of process); cf. *McGann* v. *Allen*, 105 Conn. 177, 186–87, 134 A. 810 (1926) (filing criminal complaint for purpose of compelling plaintiff to settle claim for allegedly stolen goods tends to show malice for purpose of malicious prosecution claim).[12]

The foregoing review demonstrates, at the very least, that the present case involves complexities and nuances that the majority does not fully examine.[13] There is ample support for the proposition that, when specific procedures—including "the noticing of depositions, the entry of defaults, and the utilization of various motions such as motions to compel production, for protective orders, for change of judge, for sanctions and for continuances"—are undertaken for an improper ulterior purpose, they are not subject to the litigation privilege,

regardless of whether the underlying litigation was proper. *Nienstedt* v. *Wetzel*, 133 Ariz. 348, 352–53, 651 P.2d 876 (1982); see *Hough* v. *Stockbridge*, 152 Wn. App. 328, 346, 216 P.3d 1077 (2009) ("Depositions, motions, interrogatories, and other requests for discovery or legal maneuverings to compel or prohibit action by an opponent all invoke the authority of the court. They are, therefore, the type of process that will support an abuse of process claim."), review denied, 168 Wn. 2d 1043, 234 P.3d 1173 (2010). There also is ample support for the proposition that, for purposes of the tort of abuse of process, an improper ulterior purpose may include an intent by an insurance company to harass, to drain resources, to delay payment, to coerce the opposing party into abandoning the litigation or settling. See *General Refractories Co.* v. *Fireman's Fund Ins. Co.*, supra, 337 F.3d 308; *Crackel* v. *Allstate Ins. Co.*, supra, 208 Ariz. 258–59; *Givens* v. *Mullikin ex rel. Estate of McElwaney*, supra, 75 S.W.3d 401–402.

Similarly, if an insurance company misuses a litigation procedure with the intent of avoiding or delaying the performance of its contractual obligations to an insured, I see no reason why the litigation privilege should bar a bad faith claim based on that conduct. Such a claim is far more akin to an abuse of process claim than to a defamation claim, and multiple courts have recognized that an insurance company's obligation to investigate and settle claims in good faith does not end when litigation begins. See, e.g., *Tucson Airport Authority* v. *Certain Underwriters at Lloyd's, London*, 186 Ariz. 45, 48, 918 P.2d 1063 (App. 1996) ("[t]he duties [of good faith and fair dealing] would be rendered meaningless if . . . the litigation privilege could be employed to excuse a breach of those duties, which occurs as part of the conduct of a coverage action"), review denied, Arizona Supreme Court, Docket No. 2 CA-CV 95-0052 (June 19, 1996); *Gooch* v. *State Farm Mutual Automobile Ins. Co.*, 712 N.E.2d 38, 43 (Ind. App. 1999) (insurance company's intentional refusal to investigate matter relevant to claim in order to provide counsel with "a 'litigation position' " could support bad faith claim), transfer denied, 735 N.E.2d 223 (Ind. 2000); *Federated Mutual Ins. Co.* v. *Anderson*, 297 Mont. 33, 43, 991 P.2d 915 (1999) (jury could consider insurance company's frivolous appeal as evidence of bad faith conduct);[14] *O'Donnell ex rel. Mitro* v. *Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999) ("bad faith suits are not restricted to the denial of claims, but, rather, may extend to the misconduct of an insurer during the pendency of litigation" (internal quotation marks omitted)); *Poling* v. *Motorists Mutual Ins. Co.*, 192 W. Va. 46, 48, 450 S.E.2d 635 (1994) (plaintiff is not precluded from bringing bad faith action based on insurance company's litigation conduct).

The majority states that the litigation privilege applies in this case because the plaintiff's bad faith claim "does

not require the plaintiff to challenge either the purpose of the underlying litigation or the purpose of a particular judicial procedure." Part II A of the majority opinion. This assertion is flatly incorrect. To prevail on her claim that the defendant engaged in bad faith litigation conduct, the plaintiff would be required to establish that the defendant used litigation procedures, such as filing baseless special defenses or false discovery responses, for the improper purposes alleged in her complaint, namely, "forc[ing] [the plaintiff] to undergo an unnecessarily time consuming and expensive course of litigation to obtain what was legally due to [her]" and "frustrat-[ing] [her] ability to receive benefits due [to her] under her contract."

The majority also argues that, "[i]f [this concurring and dissenting opinion] were correct that the plaintiff's factual allegations were sufficient . . . to challenge the defendant's use of the courts, any plaintiff could pierce the litigation privilege with any cause of action by merely including allegations that a defendant's conduct constituted an abuse of the judicial system." Part II A of the majority opinion. Not at all. First, I have repeatedly stressed in this opinion that my conclusions are driven largely by the special considerations that arise from the relationship between an insurance company and a first-party insured, considerations that are embedded in the common-law bad faith doctrine, including the asymmetry between the insured and the insurer with respect to bargaining power and litigation experience and the special vulnerabilities of an insured who has suffered a covered loss. See part II A of this opinion; see also part III B of this opinion (discussing similar considerations in connection with CUIPA and CUTPA). Second, some "improper purposes," such as the intent to defraud or defame, have been found not to constitute abuse of process as a matter of law for purposes of the litigation privilege; an allegation that the defendant's fraud or defamation constituted abuse of process could not survive a motion to dismiss. But, if a party can allege facts showing that a defendant has abused judicial procedures for a purpose that *has* been recognized as improper, such as to stonewall an insured who is entitled to payment of a valid claim under the applicable policy without resorting to litigation, I see no reason why the litigation privilege should bar that claim at this preliminary stage of the proceedings. Of course, the plaintiff then bears the burden of *proving* these allegations at trial.

I also disagree with majority's suggestion that a properly alleged bad faith claim based on an insurance company's litigation conduct would be subject to the litigation privilege because of the availability of alternative remedies, including a claim pursuant to General Statutes §§ 52-99[15] or General Statutes § 52-568.[16] See part II C of the majority opinion. In my view, that consideration should carry little weight if public policy other-

wise counsels in favor of recognizing such claims, particularly when, as here, the supposed "remedy" may provide no meaningful relief at all to the individual plaintiff. Unlike a lawsuit alleging bad faith, the alternative remedies identified by the majority, such as court imposed sanctions, attorney grievance proceedings and contempt proceedings, are not intended to compensate the victims who actually have been injured by bad faith litigation conduct. Indeed, such alternative remedies are also available when a party has engaged in abuse of process, yet that tort is not subject to the privilege. I would further note that, because §§ 52-99 and 52-568 make it clear that it is the strong public policy of this state to discourage dishonesty during the litigation process, those statutes *support* the plaintiff's argument that the privilege does not bar a claim that an insurance company violated its obligation of good faith by engaging in such conduct.

To summarize, I do not agree with the majority's conclusion that the plaintiff's bad faith claim is premised exclusively on false statements in the course of the litigation and, instead, would conclude that the plaintiff has adequately alleged a bad faith claim based on conduct entirely outside of the litigation. Even if I agreed with the conclusion that the plaintiff's bad faith claim is barred because it is premised exclusively on false statements in the course of the litigation, I would not agree with the remainder of the majority's analysis. I therefore dissent from part II of the majority opinion. Because the defendant makes no claim that an insurance company's bad faith conduct outside the context of litigation cannot provide the basis for a claim of negligent infliction of emotional distress, I would also conclude that the allegations in count four of the plaintiff's complaint are sufficient to withstand a motion to dismiss. If the plaintiff could demonstrate at trial that the defendant acted in bad faith within the meaning of Connecticut law, I believe that she would be entitled to recover damages for negligent infliction of emotional distress on that basis. Accordingly, I also dissent from part III of the majority opinion.

### III

I next address part IV of the majority opinion addressing the plaintiff's CUIPA/CUTPA claim. To put the matter directly, I am concerned that the majority's discussion of the litigation privilege in this case will be extended to CUIPA/CUTPA cases involving allegations that an unscrupulous insurance company is engaging in unfair claim settlement practices, in whole or in part, by purposely utilizing the litigation process, or particular litigation tactics, as an integral part of a general business with that objective. I genuinely appreciate the majority's effort to acknowledge the limited scope of its holding,[17] and, in light of that caveat, I may be overreacting to the possibility that its holding will be

extended to the situation I describe. A cautionary note seems prudent nonetheless. In part III A, I express my disappointment that the majority reaches the question at all of whether the litigation privilege applies to the CUIPA/CUTPA claim, as alleged in count five of the plaintiff's complaint; in my estimation, that claim is legally insufficient wholly apart from any issue of privilege. Part III B of this opinion takes issue with certain language used by the majority that I consider unnecessary to the opinion and better left to a case in which the issues addressed are properly before the court.

A

In my view, there is no need to address the litigation privilege at all in connection with the CUIPA/CUTPA claim, as alleged by the plaintiff in the present case. The majority correctly observes that the only part of the plaintiff's complaint coming anywhere close to asserting a CUIPA violation are her allegations that (1) the defendant responded falsely to the plaintiff's discovery requests, and (2) this conduct represents a general business practice because the defendant admitted that it did not single the plaintiff out for special treatment when it provided the false responses. See part IV of the majority opinion. I would have preferred that the majority explain that these factual assertions fail adequately to allege that the purported misconduct occurred with such frequency as to indicate a general business practice, and stop there. Instead, the majority chooses to "assume" that a general business practice is alleged, and then explains why the act of filing false discovery responses is within the scope of the litigation privilege in a CUIPA/CUTPA case. See id.

I am aware of no good reason to assume that a legally insufficient pleading is legally sufficient under these circumstances, and I consider it unwise to do so. The discussion of the litigation privilege in the majority opinion is unnecessary because the critical allegation required to state a CUIPA claim—that filing false discovery responses is part of the defendant's "general business practice"—is deficient as a matter of law. As the majority points out, the sole, relevant allegation consists of the plaintiff's assertion that "the defendant 'did not single [her] out . . . for special or unique treatment when it responded falsely to [her] discovery requests.' " Id. Even if this allegation is construed liberally, as it must be, the complaint fails to allege that the conduct at issue was committed "with such frequency as to indicate a general business practice," as CUIPA requires. General Statutes § 38a-816 (6). The allegation that the plaintiff was not singled out for special or unique treatment does not state, or even imply, that the defendant files false discovery answers frequently, as part of a general business practice, plan or strategy. It means only that the discovery misconduct of which the plaintiff complains was not undertaken against her with any

personal animus or particularized intent. The plaintiff is "the master of her complaint," as the majority points out; footnote 6 of the majority opinion; and was permitted in this case to amend that pleading numerous times before its sufficiency was tested by motion. If the plaintiff wanted to allege that the defendant frequently engages in the same misconduct with other insureds, it is not too much to require an explicit allegation to that effect.

Normally, it would not be a cause for concern that we proceed to take up a merits issue by assuming that the plaintiff's complaint states an otherwise cognizable claim. But the situation is different here for three related reasons. First, the merits issue, even in its most basic formulation—namely, the applicability of the litigation privilege to CUTPA claims—presents an important issue of first impression in this court. Second, while that issue of first impression is difficult enough in its simplest form, it becomes far more complicated in the context of a case like this one, which involves a first-party CUIPA/CUTPA claim against an insurance company. The difficulty arises because the defendants in these cases are engaged in the *business* of litigation and are therefore able, if they choose, to misuse litigation systemically in a way that distinguishes CUIPA/CUTPA claims from the type of garden-variety tort claims in which the litigation privilege traditionally applies, and that distinguishes insurance company defendants from the class of litigants traditionally subject to the privilege. Third, this particular case is very poorly suited as a means to properly address the important and difficult merits issues, not only because the factual allegations are so thin and weak, but also because neither party has provided us with adequate briefing on the CUIPA/CUTPA issue.

These three reasons help explain why I would have avoided the merits altogether with respect to the plaintiff's CUIPA/CUTPA claim. Although the majority opinion is intended to apply only to the facts as alleged, in my view, it would be better to say nothing at all, because, especially in the absence of adequate briefing, the court cannot be expected to grapple with, much less resolve, the far more complex and nuanced issues that would be implicated in CUIPA/CUTPA cases involving genuinely serious claims of unfair claim settlement practices effectuated, in whole or part, through a business practice involving litigation misconduct.

## B

The majority states that "the litigation privilege bars CUTPA claims, like the claim at issue, premised solely on general allegations of intentionally false discovery responses . . . ." Part IV of the majority opinion. In addition, the majority concludes that the claim is barred because other remedies are available. Id. This narrow holding appears to leave open the possibility that a

CUIPA/CUTPA claim that is not based *solely* on the falsity of communications made during the course of litigation would not be barred.[18] I take this as positive news. The issues under consideration are complex, and there is strong authority for the proposition that, in a case involving more robust factual allegations, conduct that is designed to harass or delay an insured can constitute abuse of process.[19] See part II C of this opinion (addressing authorities at length.) In addition, multiple courts have held that litigation conduct by an insurance company that is designed to coerce the withdrawal of a claim or a settlement unfavorable to the plaintiff may give rise to a claim of bad faith.[20] I see no reason why a CUTPA claim based on the systematic use of litigation for these purposes should be barred merely because the underlying litigation pursued by the insured was properly brought. Indeed, this point seems especially strong because the legislature has expressly recognized that an insurance company can engage in an unfair claim settlement practice by forcing an insured into litigation in order to obtain his or her contractual benefits. See General Statutes § 38a-816 (6) (G) (listing as prohibited unfair claim settlement practice "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds"). This statutory provision means that an insurance company, unlike other litigants, can abuse the litigation system merely by compelling an insured to resort to that system as a means of "dispute" resolution.

My point is not that there is a perfect identity between an abuse of process claim and a well pleaded CUIPA/CUTPA claim alleging that the defendant has engaged in unfair claim settlement practices effectuated, in whole or part, through a business practice involving litigation misconduct. A perfect fit is not required to make the litigation privilege inapplicable, or, otherwise, the majority's analysis could be stated in one sentence: a CUIPA/CUTPA claim is barred because every claim is barred that does not state a cause of action for vexatious litigation or abuse of process. As the majority recognizes, the proper inquiry, rather, is whether, when viewed in its factual context, the plaintiff's claim—whether it be for fraud, tortious interference, or a statutory violation—is more like a claim for defamation or fraud, on the one hand, or a claim for vexatious litigation or abuse of process, on the other. See *MacDermid, Inc. v. Leonetti*, supra, 310 Conn. 631 (considering whether "the allegations in the counterclaim [for retaliation] are more akin to an abuse of process claim [than] a defamation or tortious interference claim" (internal quotation marks omitted)); *Simms* v. *Seaman*, supra, 308 Conn. 547–51 (analyzing whether fraud is similar to defamation for purposes of litigation privilege). We cannot resolve the inquiry in the abstract with respect

to some future CUIPA/CUTPA claim, and I do not intend to suggest a definitive answer here. I am convinced only that it is a real issue and has not yet been properly presented or briefed before this court.

With respect to the issue of alternative remedies, the legislature enacted CUTPA with the intent "of encouraging litigants to act as private attorneys general" to combat *systemic* unfair business practices. *Stone* v. *East Coast Swappers, LLC*, 337 Conn. 589, 605, 255 A.3d 851 (2020). It undermines this intent to limit a plaintiff's remedies to sanctions, grievance proceedings and contempt proceedings restricted to particular acts of misconduct in a single case, when the allegations claim a *systemic* business practice across multiple cases.

Despite leaving open the possibility that CUIPA/CUTPA claims based on other types of litigation misconduct might not be subject to the litigation privilege, the majority suggests that, if the legislature had wanted claims based on systematic litigation misconduct to be subject to CUTPA, it "would have been explicit in abrogating the immunity . . . ." Part IV of the majority opinion. I disagree with this speculation. This court has recognized that "[t]he Connecticut General Assembly deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 755, 474 A.2d 780 (1984). "Because CUTPA is a self-avowed remedial measure . . . it is construed liberally in an effort to effectuate its public policy goals." (Citation omitted; internal quotation marks omitted.) Id., 756. In light of the legislature's deliberate choice to allow the courts to define the scope of proscribed conduct and the statute's broad remedial purpose, it seems extremely doubtful to me that the legislature's failure to expressly recognize an exception to the common-law litigation privilege for CUTPA claims involving conduct during litigation evinces an intent to bar such claims. Cf. *Barefield* v. *DPIC Cos.*, 215 W. Va. 544, 554, 600 S.E.2d 256 (2004) ("We find no caveat in the [West Virginia Unfair Trade Practices Act] . . . [that] states that an insurance company or other person in the business of insurance . . . has a duty to refrain from unfair methods of competition or unfair or deceptive acts or practices [only] prior to the filing of a lawsuit by a party, but has no such duty thereafter. We find nothing to show that the public policy established in [the statute] is obviated once litigation ensues. We therefore must conclude that the language of the [statute] does not restrict the scope of the conduct that is proscribed . . . to that which occurred prior to the filing of a lawsuit." (Internal quotation marks omitted.)).[21] This is especially so because, as discussed, the legislature expressly included litigation related misconduct as one means by which an insurance company could engage in unfair claim

settlement practices. See General Statutes § 38a-816 (6) (G). It would be incongruous for the legislature to have declared such conduct unlawful if it believed that the policies underlying the litigation privilege should apply to insurance companies defending first-party claims. In any event, the parties have not given us a word of briefing on the issue, and the facts of the case provide us with an extremely poor framework within which to decide the issue. Indeed, the majority appears to agree that, in the appropriate, future case, we could decide, like the court in *Barefield*, that the balancing of public policy interests clearly weighs in favor of allowing properly pleaded CUTPA claims based on systemic abusive litigation tactics by insurance companies in furtherance of an unfair claim settlement practice. As I explained in part II of this opinion, it is well established that insurance contracts impose, at the very least, a duty of good faith and fair dealing running from an insurer to its insured, and several courts have held that that obligation continues during and within the litigation process. When the proper case arises, we should seriously consider the possibility that systemic imbalances between insurers and insureds make it tempting and profitable for insurance companies to violate this obligation of good faith as a general business practice. See J. Ellison & T. Law, "Bad Faith and Punitive Damages: The Policyholder's Guide to Bad Faith Insurance Coverage Litigation—Understanding the Available Recovery Tools," American Law Institute—American Bar Association Continuing Legal Education, Westlaw No. SK095 ALI-ABA *251, *259–72 (June 16, 2005) (discussing systemic imbalances between insureds and insurers). As one court has observed, "[i]nsurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its financial resources balanced against the effect on its reputation of a hard-ball approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to cover if the insurer refuses without justification to pay a claim. Insurance contracts are like many other contracts in that one party (the insured) renders performance first (by paying premiums) and then awaits the counter-performance in the event of a claim. Insurance is different, however, if the insurer breaches by refusing to render the counter-performance. In a typical contract, the [nonbreaching] party can replace the performance of the breaching party by paying the [then prevailing] market price for the counter-performance. With insurance this is simply not possible. This feature of insurance contracts distinguishes them from other contracts and justifies the availability of punitive damages for breach in limited circumstances." (Footnotes omitted; internal quotation marks omitted.) *E.I. DuPont de Nemours & Co.* v. *Pressman*, 679 A.2d 436, 447 (Del. 1996).

As I indicated, insurance is also different because

insurance companies are effectively in the business of litigation.[22] "[I]nsurance companies are bulk purchasers of legal services; they incur proportionately lower litigation costs than their policyholders, and can reuse work product from case to case." J. Ellison & T. Law, supra, *270; see id., *264 ("[l]itigation is the bread and butter of liability insurance companies and they are comfortable with it"). In 2005, "[t]he insurance industry . . . admitted that it [spent] one billion dollars a year in so-called 'coverage litigation' " in the property and casualty field alone. Id., *265 and n.32. Even with these enormous expenditures, insurance companies can profit by engaging in dilatory litigation tactics because "insurance companies earn investment income—a profit— during an insurance coverage dispute with a policyholder. This is done by continuing to invest the policyholder's premiums and the reserves for the duration of the dispute." Id., *270. "If its investments have been good, it may even have made enough to cover any prejudgment interest, costs, or consequential damage[s] award, or counsel fees collected by the policyholder." (Internal quotation marks omitted.) Id., *272. This systemic imbalance "allow[s] insurance companies to wage wars of attrition against individual policyholders who litigate an insurance dispute once in a lifetime."[23] Id., *270. Even if an insurance company occasionally loses money in a particular case, the system ensures that insurance companies will profit from a general practice of using litigation to coerce lowball settlements and, if that is not possible, to delay payment as long as possible.

In light of the foregoing, members of this court— properly briefed by the parties in a case raising the issues squarely, as the present case does not—may well conclude that public policy weighs in favor of the conclusion that the litigation privilege does not bar CUIPA/ CUTPA claims based on systematic litigation conduct by an insurance company in furtherance of an unfair claim settlement practice. If the litigation privilege does not bar abuse of process claims or bad faith claims based on litigation conduct in an individual case, there is indeed a very strong argument that the systematic abuse of litigation procedures as a general business practice in violation of CUTPA should not be subject to the privilege. Perhaps it would make far better sense to hold that the privilege should be limited to its historic application to defamation claims and causes of action that are similar to that tort, i.e., those based on false statements made during the litigation that are not part of a systemic business practice prohibited by law. Public policy surely does not weigh in favor of extending the privilege to systematic litigation conduct in clear violation of the law; cf. *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 170, 757 A.2d 14 (2000) (" 'we exclude from the [attorney-client] privilege communications made in furtherance of crime or fraud because the costs to truth-seeking outweigh the justice-

enhancing effects of complete and candid attorney-client conversations' "), quoting *In re Grand Jury Proceedings*, 183 F.3d 71, 76–77 (1st Cir. 1999); and it is unreasonable to assume that the legislature intended otherwise merely because it failed to expressly exempt CUTPA claims from the privilege. I therefore disagree with the majority's dictum to the extent that it suggests that the litigation privilege would bar all CUTPA claims based on conduct during litigation.

I agree, however, that the plaintiff in the present case did not adequately allege a CUTPA claim. Accordingly, I concur in part IV of the majority opinion, in which the majority concludes that the trial court properly dismissed that claim.

[1] I refer to Liberty Mutual Fire Insurance Company as the defendant. See footnote 1 of the majority opinion.

[2] The privilege has its origins in the law of defamation and, as such, is concerned with misconduct by spoken or written word. See, e.g., *Simms* v. *Seaman*, 308 Conn. 523, 531–35, 69 A.3d 880 (2013). This qualification does not much limit the scope of the privilege because almost all litigation activity is verbal in nature.

[3] See 3 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2011) § 40:7, pp. 40-11 through 40-12 ("The insurer has a duty of good faith and fair dealing toward the insured. This duty arises out of the special relationship that exists between the parties because of their unequal bargaining power and the potential for an insurer to take advantage of an insured's hardships when negotiating to settle or resolve a claim. . . . When determining whether to settle a claim, the insurer must give at least as much consideration to the well-being of the insured as it does to its own interests." (Footnotes omitted.)); see also *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*, 34 Conn. Supp. 46, 51, 375 A.2d 428 (1977) (concluding that tort action by insured against insurer for bad faith is justified in light of "the unequal bargaining power of the parties, the special nature of the insurance business, and the disastrous economic effects that a [bad faith] refusal to pay may cause the insured"). I discuss this point in part II A of this opinion.

[4] I am not sure that this is the effect intended by the majority, which seems open to the idea that another case with different facts involving litigation misconduct by an insurance company may fall outside the scope of the privilege. See footnote 17 of this opinion and accompanying text.

[5] Because the plaintiff's claim of negligent infliction of emotional distress is premised on the conduct that forms the basis of her bad faith claim, I also would conclude that the negligent infliction claim is sufficient to withstand a motion to dismiss. I therefore dissent from part III of the majority opinion, as well.

[6] General Statutes § 38a-816 (6) defines "unfair claim settlement practices" as follows: "Committing or performing with such frequency as to indicate a general business practice any of the following: (A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based upon all available information; (E) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (G) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; (H) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; (I) attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured; (J) making claims payments to insureds or beneficiaries not accompanied by statements setting forth the coverage under which the payments are being made; (K) making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose

of compelling them to accept settlements or compromises less than the amount awarded in arbitration; (L) delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; (M) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; (O) using as a basis for cash settlement with a first party automobile insurance claimant an amount which is less than the amount which the insurer would pay if repairs were made unless such amount is agreed to by the insured or provided for by the insurance policy."

[7] We have observed in dictum that "an insurer generally has a fiduciary relationship with its insured." *State* v. *Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013). But see *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 641, 804 A.2d 180 (2002) ("[j]urisdictions are split on the issue of whether an insurer owes a fiduciary duty to its insured; our case law is silent on this issue").

[8] The majority states that, "[a]s the master of her complaint, the plaintiff never argued to the trial court—and has not argued before this court—that she premised any of her claims on conduct that occurred outside the course of a judicial proceeding." Footnote 6 of the majority opinion. I agree that the plaintiff has not framed her argument in terms of prelitigation/postlitigation conduct. But this court is addressing an important legal issue, and we are not bound by the precise rubric and line drawing employed by the parties in arguing their respective positions. See, e.g., *Meribear Productions, Inc.* v. *Frank*, 340 Conn. 711, 732, 265 A.3d 870 (2021) ("it is well established that [w]e may . . . review legal arguments that differ from those raised by the parties if they are subsumed within or intertwined with arguments related to the legal claim before the court" (internal quotation marks omitted)). This is especially true when, as here, the scope of a court's subject matter jurisdiction is being adjudicated. Cf. *Fort Bend County* v. *Davis*,       U.S.        , 139 S. Ct. 1843, 1849, 204 L. Ed. 2d 116 (2019) ("Characterizing a rule as a limit on [subject matter] jurisdiction renders it unique in our adversarial system. . . . Unlike most arguments, challenges to [subject matter] jurisdiction may be raised by the defendant at any point in the litigation, and courts must consider them sua sponte." (Citation omitted; internal quotation marks omitted.)). Indeed, if, in light of the novelty and complexity of the issues presented, the briefing of both parties in this appeal leaves something to be desired and provides insufficient guidance for the proper adjudication of those issues, it is fair to say that the majority itself has not relied exclusively on arguments that are found in the defendant's brief. In my estimation, this is a good thing, because, otherwise, its opinion would fail to serve its public function.

To the extent that the majority is making a different point—by suggesting that, "[a]s the master of her complaint," the plaintiff has failed to *allege* prelitigation misconduct as a basis for her claim—I simply disagree, particularly when reading the complaint liberally, as we must. The plaintiff's complaint alleged, among other things, that, prior to the commencement of litigation, the defendant knew that the plaintiff (1) was not at fault in the underlying automobile accident, (2) had complied with all of her duties as a covered person under the insurance policy issued by the defendant, and (3) was legally entitled to recover underinsured motorist benefits from the defendant under the policy. The complaint then expressly alleged that, by engaging in the conduct alleged therein, the defendant violated its duty of good faith and fair dealing by "*compel*[*ing*] [*the plaintiff*] *to resort to litigation to obtain what was due to her from* [*the defendant*] *under the . . . insurance policy* . . . ." (Emphasis added.) I take these allegations, liberally but fairly construed, to state a claim that the plaintiff was contractually entitled to obtain payment of her claim without resorting to litigation but was left no choice by the defendant's prelitigation conduct to commence litigation to obtain what was rightfully hers.

[9] Regarding the majority's conclusion that the plaintiff's bad faith claim is barred because it is based on false statements, I agree that the allegation relating to the defendant's filing of false discovery responses could be accurately characterized as an allegation of making false statements but offer two observations in response. First, as explained in part II B of this opinion, the bad faith count is not based *solely* on improper conduct in the litigation

itself; it also expressly alleges a claim based on the defendant's prelitigation misconduct, namely, the conduct "compel[ing] [the plaintiff] to resort to litigation to obtain what was due to her from [the defendant] under the . . . insurance policy . . . ." The litigation misconduct is a continuation of the prelitigation misconduct. Second, to the extent that the allegations regarding false discovery responses are necessary to sustain the claim, that fact itself does not trigger the privilege. False statements in litigation will fall outside of the privilege if those statements are made in service of a misuse of the litigation process itself. Indeed, verbal statements in litigation are the means by which a party carries out the torts of vexatious litigation and abuse of process. The statements at issue in the present case are hardly gratuitous or peripheral in an underinsured motorist case; discovery responses identifying witnesses are mandatory, they are signed under oath, and they are meant to be relied on by the opposing party. See Practice Book Form 213 (plaintiff's interrogatories for uninsured/underinsured motorists cases). If the defendant's pleadings and response to these interrogatories were false, and if intended to weaken her resolve to pursue the litigation and to compel her to abandon her claim or to accept substantially less than the amount to which she is entitled, the false statements were part and parcel of the defendant's abuse of process. In other words, unlike a fraud claim, in which the essence of the claim is that the falseness of a communication *itself* injured the opposing party, the claim here is that the false litigation communications were a tactic intended to prolong the litigation and to wear down the plaintiff, in violation of the common-law and statutory duties the defendant owed to the plaintiff.

[10] In *Simms* v. *Seaman*, supra, 308 Conn. 523, we analyzed whether fraud claims are sufficiently similar to abuse of process claims and vexatious litigation claims to be exempt from the litigation privilege. We stated that, to avoid the litigation privilege, "abuse of process claims must allege the improper use of litigation to accomplish a purpose for which it was not designed. . . . Likewise, vexatious litigation claims must allege, inter alia, that the defendant acted primarily for a purpose other than that of bringing an offender to justice and without probable cause." (Citation omitted; internal quotation marks omitted.) Id., 546. The majority in *Simms* concluded that fraud claims based on litigation conduct are barred by the privilege because, unlike abuse of process claims, they "[do] not require consideration of whether the underlying purpose of the litigation was improper but, rather, whether an attorney's conduct while representing or advocating for a client during a judicial proceeding that was brought for a proper purpose is entitled to absolute immunity." Id., 546–47.

I have no quarrel with *Simms*, but it would be a serious mistake to view that case as holding that any claim of litigation misconduct involving false speech is always covered by the litigation privilege, so long as the "underlying purpose of the litigation" itself is legitimate. That conclusion would, in one stroke, largely eviscerate the tort of abuse of process as explicated in § 682 of the Restatement (Second) of Torts, *Mozzochi* v. *Beck*, supra, 204 Conn. 494, and other leading authorities. We know that *Simms* could not have intended such a result, moreover, because our case law, including *Simms* itself, acknowledges that such claims are outside the privilege.

[11] I note, for example, that there is little clarity regarding the scope and meaning of the term "process." This court has recognized that "most courts that have considered the issue have construed the term process broadly." *Larobina* v. *McDonald*, 274 Conn. 394, 406, 876 A.2d 522 (2005); see, e.g., *Nienstedt* v. *Wetzel*, 133 Ariz. 348, 352, 651 P.2d 876 (1982) (process "has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process"); *Nienstedt* v. *Wetzel*, supra, 352–53 ("we . . . consider as 'processes' of the court for abuse of process purposes, the noticing of depositions, the entry of defaults, and the utilization of various motions such as motions to compel production, for protective orders, for change of judge, for sanctions and for continuances"); *Barquis* v. *Merchants Collection Assn. of Oakland, Inc.*, 7 Cal. 3d 94, 104 n.4, 496 P.2d 817, 101 Cal. Rptr. 745 (1972) ("[p]rocess, as used in the tort of abuse of process, has never been limited to the strict sense of the term, but instead has been interpreted broadly to encompass the entire range of procedures incident to litigation" (internal quotation marks omitted)); *Hough* v. *Stockbridge*, 152 Wn. App. 328, 346, 216 P.3d 1077 (2009) ("Depositions, motions, interrogatories, and other requests for discovery or legal maneuverings to compel or prohibit action by an opponent all invoke the authority of the court. They are, therefore, the type of process that will support an abuse of process claim."), review denied, 168 Wn. 2d 1043, 234 P.3d 1173 (2010). As we stated in *Larobina*, "[t]his broad reach of the abuse of process tort can be explained historically, since the tort evolved as a [catchall] category to cover improper

uses of the judicial machinery that did not fit within the earlier established, but narrowly circumscribed, action of malicious prosecution." (Internal quotation marks omitted.) *Larobina* v. *McDonald*, supra, 406. A number of courts have held, however, that not *all* litigation procedures constitute "process." See *California Physicians' Service* v. *Superior Court*, 9 Cal. App. 4th 1321, 1330, 12 Cal. Rptr. 2d 95 (1992) (Although an insurance company's "ridiculously low" settlement offer could be introduced as evidence of bad faith, "[d]efensive pleading, including the assertion of affirmative defenses, is communication protected by the absolute litigation privilege. Such pleading, even though allegedly false, interposed in bad faith, or even asserted for inappropriate purposes, cannot be used as the basis for allegations of ongoing bad faith. No complaint can be grounded [on] such pleading."); *Ritter* v. *Ritter*, 381 Ill. 549, 555, 46 N.E.2d 41 (1943) ("Under [Illinois] jurisprudence the defendant may present any defense to such an action that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is [wilful], intentional, malicious or fraudulent."); W. Barker et al., "Litigating About Litigation: Can Insurers Be Liable for Too Vigorously Defending Their Insureds?," 42 Tort Trial & Ins. Prac. L.J. 827, 854 (2007) ("[t]he cases almost uniformly reject plaintiffs' attempts to impose liability based on allegedly frivolous defenses, supposedly asserted only to delay an inevitable recovery"); cf. *Dean* v. *Kirkland*, 301 Ill. App. 495, 509–10, 23 N.E.2d 180 (1939) (filing of false pleadings, falseness of which would be determined during course of underlying proceeding, was not abuse of process). But see *Aranson* v. *Schroeder*, 140 N.H. 359, 366–67, 671 A.2d 1023 (1995) (adopting tort of malicious defense if defendant raises defense without probable cause for purpose of harassing opponent or delaying litigation, and proceeding is terminated in favor of plaintiff). Other authorities have limited the tort to process of a type that compels "the performance or forbearance of some prescribed act." (Internal quotation marks omitted.) *Long* v. *Long*, 136 N.H. 25, 31, 611 A.2d 620 (1992); see *Board of Education of Farmingdale Union Free School District* v. *Farmingdale Classroom Teachers Assn.*, *Inc.*, *Local 1889*, *AFT AFL-CIO*, 38 N.Y.2d 397, 400–404, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975); see also 1 Am. Jur. 2d 492, Abuse of Process § 2 (2016) (" 'process,' the abuse of which may support an abuse of process claim, is not limited to the original pleadings; depositions, motions, interrogatories and other requests for discovery, or legal maneuverings *to compel or prohibit action by an opponent* all invoke the authority of the court and are, therefore, the type of process that will support an abuse of process claim" (emphasis added)).

[12] But see *Bird* v. *Rothman*, 128 Ariz. 599, 602, 627 P.2d 1097 (App. 1981) ("[t]here was no proof of an improper use of judicial process . . . as the purpose of settlement is includable in the goals of proper process"), review denied, Arizona Supreme Court (May 5, 1981), cert. denied, 454 U.S. 865, 102 S. Ct. 327, 70 L. Ed. 2d 166 (1981); *Azer* v. *Myers*, 8 Haw. App. 86, 129–30 and n.38, 793 P.2d 1189 (trial court properly instructed jury that "[t]he commencement of a lawsuit for the purpose of obtaining a settlement (which may include the payment of money or insurance proceeds) is included in the goals of proper process and, therefore, does not by itself give rise to liability for abuse of process"), rev'd in part on other grounds, 71 Haw. 506, 795 P.2d 853 (1990); *Myers* v. *Cohen*, 5 Haw. App. 232, 244, 687 P.2d 6 ("[e]ven if frivolous, the counterclaim had the purpose of settlement which is includable in the goals of proper process" (internal quotation marks omitted)), rev'd on other grounds, 67 Haw. 389, 688 P.2d 1145 (1984); *Ritter* v. *Ritter*, 381 Ill. 549, 555, 46 N.E.2d 41 (1943) ("Under [Illinois] jurisprudence the defendant may present any defense to such an action that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is [wilful], intentional, malicious or fraudulent."); W. Barker et al., "Litigating About Litigation: Can Insurers Be Liable for Too Vigorously Defending Their Insureds?," 42 Tort Trial & Ins. Prac. L.J. 827, 854 (2007) ("[t]he cases almost uniformly reject plaintiffs' attempts to impose liability based on allegedly frivolous defenses, supposedly asserted only to delay an inevitable recovery"). At least one such case arises in the first-party insurance context. See *California Physicians' Service* v. *Superior Court*, 9 Cal. App. 4th 1321, 1330, 12 Cal. Rptr. 2d 95 (1992) (Although an insurance company's "ridiculously low" settlement offer could be introduced as evidence of bad faith, "[d]efensive pleading, including the assertion of affirmative defenses, is

communication protected by the absolute litigation privilege. Such pleading, even though allegedly false, interposed in bad faith, or even asserted for inappropriate purposes, cannot be used as the basis for allegations of ongoing bad faith. No complaint can be grounded [on] such pleading.")

[13] I do not fault the majority in this regard. As I have indicated, the plaintiff's allegations of bad faith are relatively weak, and neither party has adequately briefed the underlying legal complexities involved. To modify the adage, bad facts and inadequate briefing make bad law.

[14] Thus, even if litigation misconduct in furtherance of an unfair claim settlement practice cannot provide the basis for a bad faith violation, it should be admissible as evidence of one.

[15] General Statutes § 52-99 provides: "Any allegation or denial made without reasonable cause and found untrue shall subject the party pleading the same to the payment of such reasonable expenses, to be taxed by the court, as may have been necessarily incurred by the other party by reason of such untrue pleading; provided no expenses for counsel fees shall be taxed exceeding ten dollars for any one offense."

[16] General Statutes § 52-568 provides: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

[17] I refer in particular to the following passage in the majority opinion: "This [holding] does not mean . . . that a defendant enjoys absolute immunity for all CUTPA claims under the litigation privilege, even those premised on a violation of CUIPA. Rather, we merely hold that this specific claim—a business practice of filing false discovery responses—is afforded absolute immunity. . . . Our holding leaves open the possibility that other CUTPA claims may not be barred by absolute immunity under the litigation privilege." Part IV of the majority opinion.

[18] All of the cases cited by the majority in support of its conclusion that the litigation privilege bars CUTPA claims involved claims by the plaintiff that the defendant had provided false information during a judicial proceeding. See *Graham* v. *U.S. Bank, National Assn.*, Docket No. 3:15-cv-0990-AC, 2015 WL 10322087, *15 (D. Or. December 2, 2015) (privilege protects communications made during judicial proceeding), report and recommendation adopted, 2016 WL 393336 (D. Or. February 1, 2016); *Trent* v. *Mortgage Electronic Registration Systems, Inc.*, 618 F. Supp. 2d 1356, 1360 (M.D. Fla. 2007) (privilege applies to communications in judicial proceedings), aff'd, 288 Fed. Appx. 571 (11th Cir. 2008); *PSN Illinois, Inc.* v. *Ivoclar Vivadent, Inc.*, Docket No. 04 C 7232, 2005 WL 2347209, *6 (N.D. Ill. September 21, 2005) (litigation privilege precludes deceptive trade practices claim based on statements made in course of litigation); *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 725, 161 A.3d 630 (2017) (privilege confers immunity on "those who provide information in connection with judicial and quasi-judicial proceedings" (internal quotation marks omitted)); *Tyler* v. *Tatoian*, 164 Conn. App. 82, 94, 137 A.3d 801 (statements made in course of judicial proceedings are privileged), cert. denied, 321 Conn. 908, 135 A.3d 710 (2016). For the reasons stated in the body of this opinion, I believe that a strong argument can be made that the policy considerations underlying this rule carry much less weight when the defendant has made it a *business practice* to provide false information in judicial proceedings. Even if the majority is correct, however, that false statements in the course of litigation are always subject to the privilege, that would not mean that CUIPA/CUTPA claims based on other litigation misconduct designed to harass the plaintiff or delay the proceedings would be barred. See part II of this opinion.

[19] See, e.g., *General Refractories Co.* v. *Fireman's Fund Ins. Co.*, supra, 337 F.3d 308; *Crackel* v. *Allstate Ins. Co.*, supra, 208 Ariz. 258–59; *Givens* v. *Mullikin ex rel. Estate of McElwaney*, supra, 75 S.W.3d 401–402.

[20] See *Tucson Airport Authority* v. *Certain Underwriters at Lloyd's, London*, supra, 186 Ariz. 48; *Gooch* v. *State Farm Mutual Automobile Ins. Co.*, supra, 712 N.E.2d 43; *Federated Mutual Ins. Co.* v. *Anderson*, supra, 297 Mont. 43–44; *O'Donnell ex rel. Mitro* v. *Allstate Ins. Co.*, supra, 734 A.2d 906; *Poling* v. *Motorists Mutual Ins. Co.*, supra, 192 W. Va. 48.

[21] The court in *Barefield* also concluded that, although "the conduct of an insurance company or other person in the business of insurance during the pendency of a lawsuit may support a cause of action under the West Virginia Unfair Trade Practices Act," "an insurance company cannot be held liable . . . for the actions of a defense attorney retained to defend an

insured, when the defense attorney's strategy and tactics are a result of the attorney's independent, professional discretion with regard to the representation of the client-insured, and are not otherwise relied [on] or ratified by the insurance company in a manner contrary to the [a]ct." *Barefield* v. *DPIC Cos.*, supra, 215 W. Va. 559.

The majority cites to *Harrison* v. *Nationwide Mutual Fire Ins. Co.*, 580 F. Supp. 133, 136 (E.D. Pa. 1983), for the proposition that "an unfair insurance practices claim [that] is premised on pleadings or documents filed in and relevant to an underlying judicial proceeding . . . is absolutely privileged, even if the statements were made falsely or maliciously." Part IV of the majority opinion. The majority misreads *Harrison*. The claim in that case was not that the defendant insurance company had violated Pennsylvania's Unfair Insurance Practices Act by systematically abusing the judicial process for the purpose of coercing the abandonment of claims or favorable settlements. Rather, the plaintiffs claimed that the insurance company had *defamed* them by claiming that the house fire for which the plaintiffs sought coverage was caused by arson and that they had misrepresented their damages. Id., 134. The court held that a defamatory statement contained in an answer to a complaint is "*absolutely privileged* and . . . even if made falsely or maliciously and without reasonable and probable cause, *is an absolute bar* to an action of libel based on such averments." (Emphasis in original; internal quotation marks omitted.) Id., 136. This is hardly surprising, as defamation is the paradigmatic tort to which the privilege applies. Although the plaintiffs in *Harrison* did raise a claim under Pennsylvania's Unfair Insurance Practices Act; see id., 137; the basis for the claim was not stated, and there is no indication that the insurance company raised a litigation privilege defense to the claim. Rather, the court concluded that the claim was barred because "[t]he relief sought by [the] plaintiffs [namely, damages in excess of $20,000] is not what [the Unfair Insurance Practices] Act provides as a penalty for its violation." Id., citing *Nazer* v. *Safeguard Mutual Assurance Co.*, 293 Pa. Super. 385, 439 A.2d 165 (1981); see *Nazer* v. *Safeguard Mutual Assurance Co.*, supra, 387 (Pennsylvania act does not create private cause of action).

[22] The majority points out that "this court consistently has applied the litigation privilege to attorneys, who, without a doubt, are in the business of litigation." Footnote 18 of the majority opinion. The comparison between litigation attorneys and insurance companies is inapt. First, litigation attorneys, unlike liability insurance companies sued in first-party actions, do not owe any duty of care (except as imposed by ethical rules) to the opposing party, whereas liability insurance companies owe a heightened duty of care to their insureds. Compare *State* v. *Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013) (stating, albeit in dictum, that "an insurer generally has a fiduciary relationship with its insured"), with *Mozzochi* v. *Beck*, supra, 204 Conn. 497 (stating that liability rules must not "interfere with the attorney's primary duty of robust representation of the interests of his or her client"). Second, attorneys, unlike insurance companies, are categorically excluded from CUTPA in connection with their litigation activities, privileged or not. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997) (CUTPA applies to attorneys only with respect to "the entrepreneurial or commercial aspects of the profession"). Third, the crux of the problem that I address in this opinion is precisely that liability insurance companies, *as parties*, are in the business of litigation *in furtherance of their business interests outside of litigation*, i.e., as insurance companies. Their unusual hybrid character enables them, if so inclined, to *systematically* misuse their litigation activities *for the purpose of furthering that nonlitigation business activity*. Litigation attorneys who engage in wrongful litigation conduct, by contrast, have both feet firmly planted in the business of litigation; any systemic abuse they may perpetrate occurs wholly within the judicial system and is subject to its disciplinary oversight. Fourth and finally, insurance companies are in the business of litigation, *whereas insureds are not*, which I believe is one of the primary reasons that the law imposes a common-law and statutory duty of good faith in connection with, among other things, an insurance company's litigation related conduct. At least when the system is working properly and each side is represented by counsel, no comparable imbalance exists with respect to litigation attorneys, because each party has one. At the very least, even an unrepresented party knows that it is not "in good hands" when relying on opposing counsel.

[23] As the court in *Poling* v. *Motorists Mutual Ins. Co.*, supra, 192 W. Va. 46, stated, "[o]ften in lawsuits, there is a disparity of bargaining power between the plaintiff and [the] defendant. In most cases, the defendant has a resource advantage over the plaintiff and is able to draw out a trial into a prolonged blizzard of mindless motions, countless continuances, and dreadful delay.

"The mere fact that after months of delay and hassle the insurance company deigns to speak to the injured party and settles the case for the policy limits after realizing that the plaintiff is not going to accept some outlandish [lowball] offer, does not automatically preclude the plaintiff from later bringing a bad faith action that includes a request for punitive damages." (Internal quotation marks omitted.) Id., 48.

––––––––––––––––––––––––––––